Case number 10-0540, John Liz v. CHICA Trucking. Good morning. Good morning, Your Honor. Scott Incher, ENCHR, on behalf of the Department of Public Trafficking. Good morning, Your Honor. This is David Osborne on behalf of Defendants Appley, CHICA Trucking, Inc. Good morning. I don't know if both of you were here earlier, but I did announce that Justice Garcia will be the third panel member on this case. He's not available here today, but he will fully participate in the disposition and, of course, the arguments will be available for his review. So with that, Mr. Incher, you may proceed. Thank you, Your Honor. May I please report, counsel? Plaintiff appellant is here today asking this court for a reversal of the order of summary judgment entered by the trial court in this case, which we believe to be in error primarily because of the application of the wrong standard, most notably the standard for granting summary judgment, as well as the misapplication of the principal case that the trial court used was a chiseled decision. Before we get into that, let me ask you a couple questions. To start off with, we have a complaint here in negligence. You have A through G as subsections. A through D talk about seat belts and driver's side door. Would you agree that the summary judgment would be good as to those items? I do not believe it would be good to those items from the standpoint that was not what was at issue, either raised in the motion or in the arguments that were made to the motion. Well, the motion was that there was no duty. The motion was that there was no duty. Well, how could there be a duty as to the seat belts and the driver's side door when that's not really an issue as far as what's in the deposition testimony? There was no testimony that the seat belts and the driver's side door was going to be repaired. No, that is true, Your Honor. Those were the allegations made when the complaint was originally filed and through the discovery process. Those were defects in the truck, and they became questions, were those defects approximate causes of the injury? They were not approximate causes of the crash itself, but did they in some way, shape, or form, were they approximate cause of the injury? No, no, here, here. Let's get on the right issue, okay? Let's get on the right issue here. Is it your contention that there was an undertaking as to the seat belts and the doors? Yes or no? At the time of this crash, at that time, no, there was not, Judge. All right. So, therefore, the summary judgment would be good as to those allegations. Would they not? I would submit, based upon an analysis, it's possible, but those arguments weren't written, so I'm not sure. The argument was that there was no duty, so they would fall under that, would they not? It's quite possible they may. Possible. I mean, see, this is a pencil. It's not an elephant. You call it an elephant, you lose your credibility. Now, let's start all over again. As to seat belts and side door, that summary judgment was good as to those items. Yes, it was, Judge. Thank you. Now you may proceed. Unfortunately, it wasn't good, Judge, as it relates to the brakes. Okay. Because there was a voluntary undertaking specific to that, and that goes to the heart of where the trial court made its mistake. What do we need, according to the cases, to establish a voluntary undertaking? First, we have to have, Judge, we look at the statement, second, 323, says that the defendant would be subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform the undertaking if his failure to exercise such care increases the risk of harm. What we had here was… Do the cases interpret that to suggest that there has to be some kind of a relationship between the parties? I would agree with that, and there was a relationship. What is the relationship? What kind of relationship is required under the cases interpreting voluntary undertaking? The relationship of the undertaker to warrant to the undertakee that I'm going to do something for your benefit. It need not be contractual. No, it doesn't have to be contractual, but what does it have to be? What is the relationship between Chicka Trucking and John Lewis that would, first of all, call upon the doctor? Now, we're reviewing this summary judgment, and we can affirm on any basis appearing in the record. So I want you to tell me what is this relationship, what cases would you rely on to first get us to that relationship between John Lewis, employee of SRF Trucking, and Acorn and Midway, who did work on the car, vis-a-vis Chicka, if that's how you pronounce trucking. Chicka, I believe it is. Chicka. But what is the relationship? Well, the relationship between them is in the deposition testimony of the people involved in this case shows Chicka was a trucking company that was in the same lot where SRF stored its truck. But through the testimony of the plaintiff, there was an intimate relationship between Chicka and how he ran his truck. He received his dispatch from Chicka. He was told where to go from Chicka. He was told what to do when he got there and where to take. These trucks were hired to take spoils from construction sites or other. Okay, so the relationship is that Lewis was getting assignments on a daily basis from Chicka. From Chicka, from the president and treasurer. Also, there is some evidence her husband, albeit the defense claims that he just gratuitously from time to time helped out his wife, was intimately involved in the daily operations of what went on as well. And these were over-the-road truckers who would go to different sites from a dispatch they received in the morning. Okay, so SRF had a working relationship with Chicka? Well, they claim they did not. The plaintiff claims they did. The plaintiff claims he got his direction from Chicka. SRF's president, who was a trial attorney, says they had nothing to do with each other. All right, so we can move forward from there. From that standpoint, Mr. Lewis relied upon Chicka on a daily basis, not only for his work to be done and where to go, but that's who he went to when he had issues with his truck. Now that you use the word reliance, I think reliance is very key here. I would agree with that, Judge. Okay. Now show me where there is testimony in this deposition that this plaintiff relied. When he went and told Patricia Cortez, the president and treasurer of Chicka, shortly before the crash, I have problems with the brakes of my truck. And she tells him we'll get somebody to take care of it. Then he comes back the next business day to use the truck. He's told by her it was checked out and they found nothing wrong with it. Then he went ahead and went and drove. Then he gets back in the truck and he drives it. Correct. Okay, now that reliance has to be reasonable reliance, does it not? It does. All right, if you're driving a truck, any reasonable person is driving a truck, and the brakes aren't working, okay, and the brakes are not working at all. At certain times, Judge, that's a big key. At certain times. Not all the time, but certain times. All right, at certain times. And somebody tells you that they checked out the brakes and the brakes are okay. They checked out the brakes and found nothing wrong with them. But there's a big distinction, Judge, and it's brought up in the respondent's briefs that it's not as though Ms. Cortez said they're okay. What she said, according to the plaintiff's testimony, is they were checked out and they found nothing wrong with them. When the plaintiff went and checked the truck when he went to use it again, in the yard, without a load, at low-speed conditions, they seemed to work okay. Now, these are trucks we're talking about hauling 70,000 pounds of dirt on the highway. That causes a huge load increase on the truck and the braking capacity. So when he's told, we'll have somebody take a look at it, the next time he sees that person, somebody looked at it and they found nothing wrong with it, then he checks it out himself before he goes on the road and it seems to be okay. That's what that reliance is. Didn't Mr. Lewis testify that he actually took the truck to either Acorn or Midway at some point? And that they did some work and that he felt the brakes were still not working? Prior to this incident. There was an ongoing issue with this truck over months. Correct. And so at some point he said that they weren't fixed? Correct. But he kept driving it? He kept driving it. Even though he said they weren't working? Correct. Okay. And Judge, what I submit to this Court is there may very well be substantial issues of either contributory negligence, negligence on behalf of the employer who was third-party into this case, to the garages that were there. I submit all of those things may be possible and that's for a trial or fact to sort out. But what the trial judge here did was to pigeonhole a particular set of facts that aren't really true in this case with some supporting authority, which he did with the Chisholm case. The Chisholm case talks about a landlord who routinely and habitually cleans snow and ice away in an attempt on getting hurt. And what that case says is you can't rely on past performance for some future endeavor. And that's not what happened here. We're talking about this particular incident when he came in and said, Ms. Portez, the brakes aren't working. She says we'll have somebody take a look at it. Next conversation. Somebody looked at it. They didn't find anything wrong. Is this the next day? I think it's within a couple days of when it occurred. But you're saying that routinely Mr. Lewis went through Chika to get the truck fixed. That was his testimony through Ms. Portez and her husband. It was the plaintiff's belief that her husband was the apparent agent of Chika. They were always there. He testified that he drove Chika trucks, that everything that needed to be done with the truck talked to Johnny. Johnny Spina was the husband of Patricia Portez, the president and treasurer of Chika. But this is what his employer was telling him to do. You go to these people. They'll tell you where to take our truck to have our truck fixed. His employer told him, do everything through us. And that never occurred. His employer said what his employer was supposed to say. Who was paying the bills to Acorn and Midway? That raises another question. There are certain invoices from Acorn that were sent to Chika and paid on Chika's account. For this truck? For this truck. When SRPC is a corporation that was formed by a law firm to operate a truck. Yes, yes. I'm familiar with that. And what they did was when they got the truck through a former client of theirs as well as Mr. Spina, they had the truck sent out to be inspected to make sure it was safe by the DOT to do this kind of work. Yes. There are issues as to how they got into the industry and into this market. And some evidence shows that that was through a relationship with Chika, albeit not contractual. There is evidence that some of either the initial evaluation of the truck or some repairs were billed to Chika through their ongoing invoice. Acorn Garage is right across the street from where this lot was. So there's some existing relationship there. So there is some evidence that there is a relationship amongst all of these entities as to what was going on. But to answer your question, Judge, SRF said do everything through us as any employer would. That's just not what happened because they weren't on the site. They didn't operate trucks. They didn't have foremen there. SRF really had no idea what they were doing other than they saw this as a money-making opportunity. And they relied upon Chika to kind of help out on site because that's what Chika did. Chika was a trucking company. So the trial court misapplies Chisholm to this case. There is no suggestion, plaintiff is arguing this was an ongoing relationship. We trusted you in the past, so you had to come through for us now. What the reliance is is the time when he came in and said the brakes don't work and then the president said they were looked at, they couldn't find anything wrong with them. How could that have been avoided? She could have said go to your employer. It's not our job. Go to the brake shop. It's not our job. The next time he saw her or spoke to her, she could have said I have no idea what happened. Go talk to them. I'm not sure what went on. Go talk to them. But you'll agree that in the deposition testimony of this plaintiff, he never once used the word reliance. He didn't use the word reliance, Judge, but, you know, I don't think you can hold that against him. Well, he has to rely on it, doesn't he? He does have to rely on it, but I don't think he has to testify to the word reliance that he listened to her and got in the truck. I think it's a reasonable. But if he didn't testify to the word reliance, then maybe you wouldn't be here today. That very well may be true, Judge. But I think respectfully the reliance has shown that he got in the truck and drove it, and then sometime later that day there was a catastrophic brake failure. I submit to this court also in just addressing some of the issues that are here, the primary case plaintiff cites is Borgonia. This deals with nonfeasance as well as malfeasance. I think the evidence in this case shows that nothing really was done. When he complained about the problem, nothing happened. Acorn was in this case and are no longer in this case, and the evidence from them shows they never got the truck. The time frame around when this incident occurred in late December of 2004, they did no work on the truck. But this truck was never examined by an expert. There's no expert testimony to show what actually caused the crash. We never got to that stage, Judge. I submit there is some expert information because the Illinois State Police had one of their experts go out and said this crash was from a catastrophic brake failure. They found a substantial number of the brakes were wholly and completely outside of DOT permissibility to be used on the highway. So this was not something that happened. This was not an acute situation that occurred. And her testimony was anybody looking at this would have seen this. This isn't something that, you know, somebody missed one tiny caliper that was off by a little bit. This was a catastrophic failure, and this truck should not have been on the roadway at that point in time. But that's based upon the load the truck was carrying. If it's an empty truck, the truck's going to stop, and you're really not going to see much of a problem. But as far as expert testimony to that point, Judge, we never got to that stage. This case was dismissed on summary judgment prior to a 2-13 F3 schedule. Was there evidence in the record that Acorn did, in fact, look at the truck? They looked at the truck, but not at this time. They may have looked at the truck once before for different things. Once before. Correct, but not at this time. When he came in and complained in late December, the brakes aren't working, and Ms. Cortez told them somebody would look at it. There is no evidence from Acorn that anything happened during that window of time that they ever looked at it or touched it or did anything to it whatsoever. So you think that there's stages on expert testimony? In other words, you wait somewhere down the line before you have the car examined by an expert? Respectfully, Judge, the truck was taken and sold by the employer. The inspection was done by the state police shortly after the crash. Then the truck was taken by the employer and sold. So it was not available to do that. It was not available to do any inspection. Experts would have to rely upon the photographs that the state police did. But the employer sold it to Chica sometime after the crash in the truck. The tractor and the trailer are no longer available to be tested. Respectfully, we agree with the defense on a handful of certain points. Could there be issues with Acorn? Possibly. Highly unlikely, but possibly. Are there issues with the employer? There may be. That's not what's at issue here. Under the standard for summary judgment, there cannot be any material question of fact that exists. If there is, summary judgment is inerrant. There are substantial material questions of fact that exist here when it comes to whether or not there was a reliance on the part of the plaintiff as well as whether or not there was. One of the things that the plaintiff said at his deposition was that Acorn couldn't find anything wrong with the brakes. Is that what he said that Ms. Cortez said? Ms. Cortez said they couldn't. The plaintiff testified that Ms. Cortez said to him they couldn't find anything wrong with it. Not Acorn? He said they. Can we infer from they being Acorn? His counsel refers to the testimony and he uses the word that Acorn couldn't find anything wrong with the brakes. There are some inconsistencies in the plaintiff's deposition testimony where he testifies to a variety of things. But if he basically says that Acorn said there's nothing wrong with the brakes, how does he rely on that to get to Cortez? Because he got his information from Cortez. He went to Cortez with a problem and Cortez provided him the answer to the problem. He didn't have the interaction with Acorn. All she said was Acorn said the brakes were okay. How does that give rise to this voluntary undertaking? Because it is the plaintiff's belief in his reliance that she took it to Acorn. No, but she didn't say I took it to Acorn. She said Acorn couldn't find anything wrong with the brakes. And the plaintiff didn't take it to Acorn. That was her choice of how to do it. He came to her and said I have a problem and she said we'll have somebody take a look at it. She chose to have Acorn take a look at it. He didn't testify to all these things that you're saying. He testified. He didn't testify that she said we took it to Acorn while in your absence. They looked at your truck. There's nothing wrong with your truck. Judge, you're right. He did not testify. What he testified to was. That Acorn said there was nothing wrong with the brakes. He testified that he went to Ms. Cortez and said I have problems with my brakes. He testified that she told him somebody will look at it. The next conversation was the plaintiff testified that Ms. Cortez said they could find nothing wrong with it. They or Acorn? Well, there's two different parts of his deposition. His testimony is they. The word they would find nothing wrong. Correct. In the record, he also says that Acorn. Yes. But I think that's a semantics position, Judge, because I don't think it matters. Well, we are talking about Acorn. Well, we're talking about Acorn who may be a cause of his injuries. Yeah. But when we're talking about a proximate cause, it need be only a cause. And a cause was the voluntary undertaking of Chica when they told him a firm. And if the claim is they had no duty, why did she offer that up? Why did she say I'll take care of you? Why didn't she say call your employer? You have any evidence in this case that Acorn at that point in time looked at the car? No. In fact, it's just the opposite. The evidence appears that Acorn never looked at it. I mean, is there evidence in the record that Acorn never looked at the car? I guess I would have to answer that no, because I don't know how we would have evidence of something that didn't happen. If that makes sense. Sure. You take their deposition. Oh, sure. Their deposition testimony? They say no. Acorn's deposition testimony was during that period of time where this was at issue in late December, truck never came in the building. Okay. That was not part of the record of this case? I don't know if it is, Judge, from the standpoint that that deposition was done. I mean, I don't see that. I only submit that that deposition may have been done after some of the judgment was granted as to this defendant. So whether that actually made it into the record or not, respectfully, I can't tell the Court. I looked at the record. I didn't see it. And that's the likelihood that that was done after this motion was already being. . . You can sum up and then we'll let you have time to rebut. Sure. Respectfully, Your Honors, the trial court misapplied the standard for summary judgment. There are material questions of fact as it relates to the voluntary undertaking of this defendant. That voluntary undertaking was relied upon by the plaintiff to his detriment. He sustained substantial injuries as a result of that reliance. We ask that you reverse the order of summary judgment and remand this case back to the circuit court for further proceedings commensurate with the prior fact beside this case. Thank you. Thank you. Mr. Osborne. Good morning, Your Honors. Good morning. Counsel, may it please the Court. The circuit court was quite right to identify this case as one which is inappropriate for application of the voluntary, the narrow voluntary undertaking doctrine. In fact, as the trial judge put it in his order probably more succinctly than I did in my brief, there's just about everything wrong with this case that could be wrong with a voluntary undertaking case. First of all, there's no undertaking. They said the undertaking was for us to repair and inspect the truck. So, okay, forgetting about the actual undertaking, when counsel suggests that there's a relationship here, do you have any reason to dispute that at least the facts show that Mr. Lewis was getting daily assignments from Chica? There's a dispute about that. But there's a dispute. So, in other words, as a reviewing court looking at this de novo, there's a relationship at least testified to by the plaintiff that suggests that this is where he was getting his routes every day. Right. And if she had routed him off a cliff and that's what caused this accident, then this would be a negligent dispute. So, at least we know that he was, for whatever reason, he wasn't getting assignments from the company he worked for. He was getting his delivery or drop-offs of whatever he was dumping from Chica. Well, he was told by his boss, Hollingshead, and he knew who his boss was. He knew he didn't work for Chica. Right. He didn't work for them, but there was a relationship, at least according to his testimony, where he was definitely back and forth with them. The relationship, as I understand it, is that Mr. Hollingshead and Mr. Spina grew up together in the same neighborhood. Did Mr. Lewis get his assignments from them? Is there any dispute at least that that's what his testimony was? Oh, that was his testimony. All right. I'm not talking about whether it's accurate, true, or what. And we haven't tried to make a point of that. Okay, so there's a relation. Right. Now, you're saying that when she told him that they looked at the brakes or they said there's nothing wrong with the brakes, what was all that about? Well, there were basically three conversations that they're basing the duty on. The first one was the conversation right when he had the brake failure two days before the accident. He called Spina, and Spina told him to take it to Acorn. I submit that there's no way that creates any kind of a duty. He takes it to Acorn. He establishes a direct relationship with Acorn. He goes into the office. He talks to Acorn. He says, I've got a brake problem. They say we'll look at it. The yard's full. Put it across the street where you normally park the truck. And then after that comes the second conversation, which is with Pat Cortez, his testimony. And she says, put it in the yard. And he was asked immediately after that, anything else? Now, put it in the yard. Put it in the yard. Is that after Acorn told him to go put it in the yard? After. So she was confirming to him to put it in the yard. Right. Acorn created a barrier. Is that their yard? No. Just the yard they both use? In fact, there are maybe 15 different entities. Others that use that yard. Right. To park the truck. All right. That's the second conversation. Clearly, that didn't create any kind of a duty. The third conversation was the next day when he says that he talked to Pat Cortez on the phone. And he testified that Pat told him that Acorn looked at the truck and couldn't find anything wrong with it. Not that the brakes were all right. All right, I think, is a phrase that comes from nothing more than the plaintiff's brief. She never said the brakes were all right. She's not even a truck driver, much less a truck mechanic. Okay. She's not in a position to tell him whether the brakes were all right. She's in a position to tell him what somebody else told her. And that's what she did. Well, that's what the plaintiff says. But that's what he says that she said. Right, right. I'm taking the plaintiff's testimony as true. Talked about it. So, I mean, I'm not arguing with that. So what did she say again? Can you give us the third conversation to create the voluntary undertaking? That Acorn looked at the truck and they couldn't find anything wrong with the brakes. So, in other words, no work was done on the brakes because they couldn't find anything wrong with it. That's his testimony. That's his testimony. Nothing more, nothing less. That's right. All right. He's not saying Pat said the brakes were all right. I know brakes and I looked at these brakes and these brakes are great. No, nothing like that. All right. This is what Acorn said is all that Pat said. Okay. And, again, as the court has pointed out a number of times, there's nothing in this record to indicate whether Acorn actually did look at the truck, much less what, if anything, Acorn told Pat Cortez. So, in other words, if Acorn did look at the brakes and they negligently failed to discover this problem and they told Pat Cortez there's nothing wrong with the brakes and then she told the plaintiff there's nothing wrong with the brakes, then forget about duty, there's no breach. She's just relying on what somebody else told her. So what you're really telling us is that there's an indispensable thing missing here, and that is that there's nothing to show us that Acorn did not look at the car. Well, there are many indispensable things missing, but that's one of the most important ones. And, in fact, it's not in the record, but the fellow from Acorn was deposed. Well, I know, but that's not part of our record. It's not. But I think counsel intimated that that wasn't available. We have to deal with what's in our record. Sure. There's nothing in our record that shows us that Acorn did or did not look at the truck. And that's the appellant's burden, and they didn't meet that. Yes. But I just want to make sure that there's no misunderstanding. There's no reliance. There's no reasonable reliance because the plaintiff, by his own testimony, knows for a fact that when he gets in the truck on the day of the accident, the brakes are in exactly the same condition as they were two days before. When he pushed the brake pedal to the floor, nothing happened. He had to use the gears and the clutch to slow the truck down. But that happened much later as he's driving the truck. That's two days before the accident. No, I'm talking about on the day of the accident. On the day of the accident, right. On the day of the accident, he gets in the truck. Everything's working properly until he comes around that bend. On the exit. Getting off the highway. That's where the problem is. I think his testimony was pretty uniform that for several months he had periodic brake failure. Sometimes the brakes worked. Sometimes they didn't. 99% is not good enough for brakes. But didn't he also testify that he had actually physically brought the truck to either Midway or Acorn or one of these places? Acorn. And they supposedly did work on the brakes, but then the brakes still had problems even though they did this work. Right. There were numerous instances of both Midway and Acorn. And two days before, he had significant issues with the brakes. Well, yes. They were a fatal failure. A near, you know, could have killed somebody. Two days before. Two days before the accident. Okay. And then what Ms. Cortez tells him is that Acorn couldn't find anything wrong. That's the sum and sections. So they obviously did nothing on the truck. Well, that would be a reasonable inference. Maybe Acorn didn't do anything. That doesn't hurt you. Well, exactly. Maybe Acorn didn't look at the truck at all, but they told her that they did. Can you infer from that that they fixed the brakes? Is there a reasonable inference there that they fixed the brakes so that someone could reasonably rely on that? No, no. I think, in fact, I think something that the plaintiff said when he dropped the truck off to Acorn or went in and described the problem, he said the fellow at Acorn told him that there's nothing wrong with the brakes as far as he's concerned because Acorn put the brakes on the truck. So, in other words, Acorn's saying, it's all in your head, buddy. I don't even need to look at the brakes. Was that the two days before? That was the two days before. Right. Acorn told him two days before there's nothing wrong with the brakes. Well, they said there's nothing as far as I'm concerned, which is, you know, because we put the brakes on back in July. So the brakes are great. Okay. So, but he was going to Acorn with the truck. He went directly to Acorn, yes. And they said put it in the lot. We can't look at it right now. I think the lot was for. . . Put it in the yard. Yeah, they didn't. . . Put it in the yard. Yeah, the yard, which is across the street from their facilities. Okay. And. . . Well, anything further you wish to add? The Court has no questions. I have nothing further. Nothing. Thank you, Your Honor. And, Sheriff, a rebuttal? Yeah, I just have one question on rebuttal here. You know, how can we give you relief when there's nothing in the record that shows that Acorn did or did not do anything to the vehicle? I think you can give us relief, Your Honor, because I think that is something that really isn't part of the analysis. I mean, how do you have a voluntary undertaking and show that it hasn't been satisfied without showing. . . You know, you have to be able to show in a voluntary undertaking that it hasn't been satisfied. I mean, if she brought it to Acorn, then she satisfied the undertaking. And if she satisfied the undertaking, then we'd have no case. Well, what is her undertaking? What he said was there's three conversations, okay? But let's talk about the last one. Sure. Okay? Is that when the undertaking begins? Absolutely. All right. What is the undertaking when she says Acorn looked at the thing and they don't think there's anything wrong with it? That's the second half of the undertaking. The first part is where the plaintiff testified that Ms. Cortez told him that she would have the truck looked at. That's when the undertaking starts. The nonfeasance occurs. . . But didn't his company, didn't his bosses tell him to take this to Acorn? They did. And he went to Acorn, and they said, we don't have room for it right here, put it in the yard across the street. . . And then he what? And they say, we'll look at it. He doesn't say that in the record, that he said, they told me they couldn't look at it right now, put it across the street. They said we'll get to it? He testified that they told him to put in a lot across the street. And his next conversation was with the person that he received his daily dispatch from, the person he understood or believed to be someone in the supervisory capacity. He knows there's no contractual relationship, she didn't pay him, but that's who he got his orders from on a daily basis, her or her husband. The undertaking starts when he tells her, this is the problem I'm having. And the nonfeasance, the second part of the failure to follow through on the undertaking, takes place when she says, they looked at him, and this is in the record 1455. . . Who was supposed to fix this truck? Who really has the undertaking here? Ms. Cortez? I would argue that everybody does. Ms. Cortez has undertaken to fix this truck. When she tells him, we'll have somebody take a look at it, she does. She easily could have said, I'm not your employer. You know what, let's call your boss right now. Didn't his boss already tell him to take it to Acorn? Does he really need her to tell him to take it to Acorn when he's taking it to Acorn? She didn't tell him to take it to Acorn. She said, we'll have somebody take a look at it. There's a substantial difference between those two. Now, who told him to go to Acorn? This night or historically? Historically, his employer did. This particular night. Who told him to go to Acorn? I don't think anybody told him to go to Acorn that night. I'm sure that was from his prior knowledge from his employer, as well as Mr. Spina, as well as their other contact, Mr. Holland's head, that it was an ongoing relationship, and that's where he had gone in the past. Is there any case that you would like us to rely on to get this voluntary undertaking from these facts? Sure. I submit the Bergoni decision is on point with what occurred in this case and the standard that should be applied to these facts, showing there is a question of fact to this situation. Okay. And as such, we ask that some judgment be reversed. Thank you, Your Honor. The case was well argued and well briefed, and it will be taken under advisement.